William **LEISTNER** and Mary Jane Leistner, husband and wife, and John A. Whiteside and Joyce L. Whiteside, husband and wife, Appellants,

v.

**BOROUGH OF FRANKLIN PARK.**

Commonwealth Court of Pennsylvania.

Argued Feb. 5, 2001.

Decided Feb. 28, 2001.

Reargument Denied April 30, 2001.

Ronald G. Backer, Pittsburgh, for appellants.

John H. Rushford, Pittsburgh, for appellee.

Before PELLEGRINI, Judge, KELLEY, Judge, and FLAHERTY, Senior Judge.

PELLEGRINI, Judge.

William and Mary Jane Leistner and John and Joyce Whiteside (Property Owners), owners of real property located on Lin Point Court (Lin Point), appeal from an order of the Court of Common Pleas of Allegheny County (trial court) dismissing their complaint in equity to enjoin the Borough of Franklin Park (Borough) from using Lin Point as a public road.

Lin Point is located off State Route 856 (Nicholos Road), continues in a somewhat curved fashion, and, upon straightening, is then intersected by a dead-end road known as Wunderlin Road. After this intersection, Lin Point continues on and sub-

sequently reaches a dead end cul-de-sac area. It has never been laid out in a plan of lots or referred to in a deed, and at its inception, it was used as a private access way maintained by its residents and used by them and their guests to gain access to their property.[1] Beginning in the early 1960s, the Borough began to perform various maintenance tasks on Lin Point, including snow removal, the patching of potholes and applying tar and chip to the roadway.

In 1975, Clarence and Lorraine Wunderlin deeded property located off Wunderlin Drive to the Borough which it used to erect what is now known as Blueberry Hill Park (Park). Prior to the Borough's acquisition of the Park, Mr. and Mrs. Wunderlin had used the property as farmland, and from 1944 to 1959 as a small landfill that they later abandoned.

The Borough first began improvements on what is now the Park in 1977 by replacing a barn roof which was located on the property. However, the first major improvement was the construction of the first ball field which occurred between 1978 and 1979. Further, the Borough did not begin to light the ball field for night use until 1990. Moreover, it was not until 1985 that a sign was placed at the corner of Lin Point and Nicholson Road that the Park was to be accessed by Lin Point, and since acquiring the Park, the Borough has made significant changes to Lin Point, including paving the road in 1983, installing speed bumps in 1984, and placing a water line within Lin Point in 1998. Today, the Park consists of approximately four baseball fields, a track, a large playground and volleyball and basketball courts.

In May 1997, the Borough filed a declaration of taking condemning Lin Point for public roadway purposes. Based on the advice of counsel, the Borough later filed a declaration of relinquishment pursuant to Section 408 of the Eminent Domain Code[2] claiming that the road was a public road because the public had used it for 21 years.

In June 1998, Property Owners filed a complaint in equity against the Borough contending that Lin Point was a private easement over private property which was being violated by the Borough through overuse both by physically widening the road through the tarring, chipping and paving process and by unreasonably increasing the volume and nature of traffic accessing Lin Point. The relief they sought was to enjoin the Borough from using Lin Point as a public access way to the Park, and, in the alternative, if Lin Point was found to be a public road, to enjoin the Borough from illegally encroaching upon their property by impermissibly expanding the width of Lin Point beyond the original easement.

At trial, several current and former residents testified as to the nature of the easement and how the Park had increased the volume and nature of vehicle traffic on Lin Point. Beverly Wunderlin Nussbaumer, who resided at Lin Point from the 1940s until the mid–1970s, and whose now-deceased parents sold what is today the Park to the Borough, testified that when

---

1. Lin Point is not a private road in that it was never laid out in a subdivision plan or referred to in any deed. Because the parties have used it to access their properties for more than 21 years, it can best be described as easement by prescription. An easement by prescription is created by adverse, open, continuous, notorious and uninterrupted use of land for the prescriptive period—in Pennsylvania, that period is for 21 years. *POA Company v. Findlay Township Zoning Hearing Board*, 551 Pa. 689, 713 A.2d 70 n. 13 (1998), (*citing Lewkowicz v. Blumish*, 442 Pa. 369, 371, 275 A.2d 69, 70 (1971)).

2. Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. § 1–408.

the Park was used by her parents as a landfill, traffic from this use was minimal, from two to four truckloads a day. Further, she stated that for approximately three to four years, her father allowed others to use the landfill which increased traffic to approximately eight to ten truckloads a day. She further testified that children would play in the road because it was a dead-end street, and after the landfill ceased, the only traffic was from the residents, their guests and occasional delivery persons. As to Lin Point itself, she testified that when she lived there, it was a very narrow unpaved road, only one car could drive through at a time, and if two cars tried to pass each other, they would create ruts on the side of the road because of its narrowness.

Darlene J. Gerber, a resident who lived on Lin Point since 1959, testified that when she first came to live on Lin Point, it was a narrow dusty road which only one car could fit onto at a time, and by the time the Park was in operation, two cars could maneuver down the street without pulling over. She noted that the Borough began to tar and chip Lin Point in the early 1960s. Moreover, she testified that when she first moved to Lin Point, her husband would plow the snow in the winter, but she noted that an elderly couple living on Lin Point called the Borough to plow the snow for them and the Borough would do this. She testified that traffic did not change on Lin Point until after the Borough purchased the Park and constructed the ball fields. Dave Fagan, who had lived at Lin Point since 1972, testified about the increase in traffic due to the Park and noted that there was an average of 50 to 60 cars within a one-hour time frame that would access Lin Point to get to the Park.

Property Owner John A. Whiteside, who had lived on Lin Point since 1967, testified that when the Park was first sold to the Borough, there was not a significant increase in traffic, and that only with the inception of the first Park festival in 1985 did traffic increase to the point where hundreds of cars were accessing the Park through Lin Point. He further noted that the Borough's installation of lighting in the Park in 1990, which increased the hours when park patrons would come to the Park, also increased traffic on Lin Point. He stated that the chains on the gates of the Park were never locked and people could access it at all hours. In addition, he noted that there was an increase in noise in the neighborhood due to the traffic and from maintenance of the Park, including septic tank cleaning which occurred before 5:00 a.m. He testified that Lin Point used to be approximately ten feet wide and today varied from 17 to 26 feet in width. Property Owner William Leistner, who had resided at Lin Point since 1986, also testified to the extreme increases in traffic due to the construction of the Park. He noted that on differing occasions, larger vehicles were damaging residents' property.

Also testifying on Property Owners' behalf was Daniel J. Martone, a professional engineer and land surveyor, who, in 1997, was asked by Property Owners Leistners to determine if Lin Point had encroached on their property. Mr. Martone noted that Lin Point crossed the property and traversed along the westerly portion of their property. He further noted that the width of the roadway varied from 17 feet, six inches at the point where Lin Point intersected Wunderlin Drive to 19 feet at the end of the arc. Further, he stated that the gravel berm that spilled out on the side of the Lin Point was from six inches to a foot on both sides of Lin Point. Moreover, Mr. Martone noted that in addition to these measurements, he would add

a foot to two feet additional width on the gravel berm.

Not disputing that the traffic increased over Lin Point or that it had widened the road, the Borough presented the testimony of Ambrose Rocca, the Borough Manager, whose duties included overseeing Borough records. While acknowledging that there was no Borough ordinance that would show and express dedication or acceptance of Lin Point to the Borough, Ms. Rocca stated there were various records which evidenced that the Borough had been maintaining Lin Point. She produced a 1961 report listing Lin Point as one of the roads the Borough maintained for the purpose of acquiring liquid fuel reimbursement funds from the Department of Transportation; a 1963 road inspection report that delineated all municipality owned streets which listed Lin Point as a municipally owned street; a 1971 Borough Road Department report showing that the Borough put a seal coat over Lin Point to ensure road durability; a Borough ordinance adopting the dead end cul-de-sac portion of Lin Point as a public thoroughfare; and a 1988 Borough resolution seeking grant money to install a drinking water supply system within the Borough and Lin Point.

Ronald A. Merriman, the Borough's Superintendent of Public Works, who had worked for the Borough since 1967, also testified that the Borough would yearly tar and chip Lin Point, and since the 1960s, had performed other maintenance work on it which included snow removal, the patching of potholes, paving of the roadway and the installation of speed bumps.

The trial court denied Property Owners' request to enjoin the Borough from using Lin Point for access by Park patrons finding that it was a public road because it had been used by the public for 21 years. Because of the Borough's constant maintenance and improvement of Lin Point, it also found implied dedication by Property Owners and an implied acceptance of Lin Point by the Borough. Finally, the trial court found that although traffic increases on Lin Point may have been substantial as compared to its original use, the widening of Lin Point and the increase in use were gradual and the change was one of degree that did not alter the character of the road. The trial court did, however, enjoin the Borough from widening Lin Point beyond its current measurement. Property Owners' appeal then followed.[3]

Property Owners contend that the trial court erred in finding that Lin Point was a public road because the public had used it for 21 years. They contend that the earliest possible date that the public began to use Lin Point was when improvements were completed in the Park and was first opened to the public during the 1978–1979 time period, which was less than 21 years from the date of trial on July 19, 1999, and less than 21 years from the date this action was filed on July 17, 1998.

Section 1702 of the Borough Code[4] sets forth what is required in order to transform a private easement to a public roadway. It provides in pertinent part:

Any borough shall have the right at any time to take over, by laying out and/or opening the same— ...

(3) Any street to which the public shall have acquired rights by constant

---

3. Our scope of review of a final decree in equity is limited to determining whether chancellor committed an error of law or abused its discretion or whether findings of fact were supported by evidence. *Morgan v. Richter*, 724 A.2d 983 (Pa.Cmwlth.1999).

4. Act of February 1, 1966, P.L. (1965) 1656, *as amended*, 53 P.S. § 46702(3).

use over a period exceeding twenty-one years . . .

■ Even if we found that Park patron traffic was the same as use of the road by the public, nothing in the record shows that the public, as opposed to the private use of Lin Point by adjoining property owners, had used it for 21 years. Although the Borough contends that the Park was open to the public shortly after it was purchased in 1975, no testimony established that the public actually began to use Lin Point to access the Park at that time; all the testimony established was that it was not until the 1978–1979 time frame when the first recreational facility was constructed on the premises that traffic increased on Lin Point. Because Property Owners filed this action in 1998, the Borough failed to meet the statutory mandate of continued unopposed use for over 21 years necessary to convert this easement to a public road.

■ Nor has the Borough acquired rights to Lin Point as a public roadway by an implied dedication and acceptance. First, there was no implied dedication; an implied dedication only arises when lots are sold with reference to a plan that includes streets. *Borough of Lehighton v. Katz*, 75 Pa.Cmwlth. 388, 462 A.2d 889 (1983). In this case, there was no reference in the deed to any plan of lots or, for that matter, for any easement—Lin Point just seems to have appeared. Even if the deed referenced a street, there would still be no dedication. For there to be an implied dedication, there must be an act which clearly indicates an intent to dedicate. *Coffin v. Old Orchard Development Corp.*, 408 Pa. 487, 186 A.2d 906 (1962). The only act that the Borough points to as dedication is that one of the property owners along Lin Point asked the Borough to clear it of snow and the Borough did so. Further, the fact that the Borough oiled and chipped the road does not indicate that there was any implied offer; it simply indicates that someone in the Borough, for whatever reason, decided to do so. Without an implied offer, we need not even reach the issue of whether there was an implied acceptance because without an implied dedication, there can be no implied acceptance. Because nothing was offered to the Borough, Lin Point remains a private, prescriptive easement.

■ Even if we find that it is not a public street, the Borough contends that as the Wunderlin's successor in title, it has the right to use Lin Point as a "private road." Property Owners respond by contending that the Borough does not have a right to use Lin Point as an access way for Park patrons because it is placing an impermissible burden on the private easement. In *Bodman v. Bodman,* 456 Pa. 412, 321 A.2d 910 (1974), where a portion of a dominant tenement was sold and an easement was subsequently used for access to four recreational cabins built by the grantee, our Supreme Court, in finding that the increase in use by the four cabins was not an unreasonable expansion of the easement, consistent with the Restatement position, held that normal evolution of the dominant tenement permits reasonable increases in the burden imposed upon the servient tenement. As such, the question then becomes is the increase in traffic a reasonable increase so as not to unreasonably burden the other property owners that have rights in Lin Point.

Our Superior Court in *Smith v. Fulkroad,* 305 Pa.Super. 459, 451 A.2d 738 (1982), addressed a situation closely analogous to this one. It found that where the public had obtained an easement by prescription for the use of the surface of the original dirt lane used mainly for local passenger traffic, the easement could not be found to extend to cover an improved

road some 20 feet in width which increased the burden to the servient estate to include handling heavy trucks carrying 60 tons of refuse a day. In that case, the Superior Court stated:

> A fundamental principle is that an easement for the benefit of a particular piece of ground cannot be enlarged and extended.... The purpose of this rule is to prevent an increase of the burden upon the servient estate, and it applies whether the easement is created by grant, reservation, prescription, or implication. *Percy A. Brown Co. v. Raub*, 357 Pa. 271, 293, 54 A.2d 35 (1947). Advances in technology are considered to be "contemplated in the grant of an easement" 12 Pennsylvania Law Encyclopedia, 481, and testimony shows that the appellants never opposed such advances. Horse and buggy traffic slowly gave way to occasional automobile traffic and eventually automated farm equipment was also permitted. This accords with holdings that a right-of-way easement may be "used for all ordinary purposes in a reasonable manner," *Garan v. Bender*, 357 Pa. 487, 55 A.2d 353 (1947); *see also McCully v. Pittsburgh Rys. Co.*, 44 Pa.Super. 316 (1910); *Taylor v. Heffner*, 359 Pa. 157, 58 A.2d 450 (1948). The right-of-way easement in this instance could not be found to extend to cover an improved road, some twenty feet in width, handling heavy trucking in the amount of sixty tons of refuse a day.

*Id.* at 464, 451 A.2d at 740.

In this case, due to the construction of the Park, a sparsely traveled one lane dead-end road used by homeowners to access their homes with minimal use by the Wunderlins of several trucks per day, changed to a highly traveled roadway with hundreds of vehicles traversing it each day. A change from a sleepy lane to an access road to a major recreation center is not a reasonable increase in the burden imposed upon Property Owners as servient tenement owners and constitutes an undue burden on the private easement.

Accordingly, for the foregoing reasons, the order of the trial court is reversed.[5]

### *ORDER*

AND NOW, this *28th* day of *February*, 2001, the order of the Court of Common Pleas of Allegheny County, dated June 7, 2000, is reversed and the matter is remanded to the trial court to enter a decree in favor of the Appellants.

Jurisdiction relinquished.

---

**5.** Property Owners also argued that even if the Borough had acquired rights to Lin Point as a public or private roadway, it did not have the right to expand Lin Point beyond its original width. Because we have concluded that the Borough did not acquire such rights, we need not address this issue. *But see Smith.*